151 So. 78

**STATE v. DAVIS et al.**

No. 32474.

Oct. 30, 1933.

James D. Womack, of Baton Rouge, for appellants.

Gaston L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., and John Fred Odom, Dist. Atty., and Fred S. LeBlanc, Asst. Dist. Atty., both of Baton Rouge (James O'Niell, Sp. Asst. to Atty. Gen., of counsel), for the State.

OVERTON, Justice.

Defendants were tried and convicted of the crime of robbery, and sentenced to the penitentiary. They rely on eight bills of exception for a reversal.

A brief outline of the facts of the case will serve, perhaps, to give a better understanding of the bills of exception to be reviewed. The evidence shows that the two defendants are white men. The men that they are convicted of robbing are negroes, two in number, named Lonnie Williams and James Marshall. The accused and their victims were whisky runners. The negroes were hauling a load of whisky in an automobile, on the night the robbery was committed, from Opelousas to Baton Rouge. The accused were at the ferry that crosses the Mississippi from Port Allen to Baton Rouge, at the time the negroes arrived at the former place with their load of whisky. The automobile drove onto the ferryboat and the accused went aboard afoot. After the car left the ferry, defendants ordered the negroes to drive the car across the levee, under a shed, on North street, in Baton Rouge. The car was stopped, when it reached the shed, and, at the point of a pistol, defendant forced the negroes to abandon the car. The defendants then drove off in the car with the whisky to a bootlegging and gambling establishment operated by the defendant Davis, where, apparently, the whisky was unloaded. Relieved of its whisky, the car, which was still under defendants' control, was driven still farther on, where it was concealed in a garage on a lot on which stood a residence, which would be deemed vacant but for the fact that one room was occupied by a single man. The car was found in the garage several days after the robbery by the officers.

Defendants were informed against for robbing the negroes of the car, all reference to the whisky being omitted from the bill of information. The defense was that defendants did not intend to appropriate to their own use the automobile. Their position was that two of their runners had been "hijacked" by the two negroes in the parish of St. Landry, and that they were merely recovering by force their own whisky.

Bills 1, 2, 3, and 4 were taken to the refusal of the trial judge to give certain special charges to the jury. The special charges requested by defendants were:

First. "To constitute the crime of robbery there must be an original felonious intent, that is, the property must have been taken by the accused with the intention to steal it."

Second. "The animus furandi, that is, the intention to steal the property, must be proved by the state to the satisfaction of the jury beyond a reasonable doubt, and if the state fails to discharge this burden, it is the duty of the jury to acquit the accused."

Third. "Intent is an essential ingredient of the crime of robbery, and intent may be inferred from all of the facts and circumstances surrounding the case."

Fourth. "If the jury entertain a reasonable doubt as to whether or not the accused intended to steal the car of the prosecuting witness, it is their duty to acquit the accused."

The trial judge refused to give these charges to the jury, because, in his opinion, they were covered by the general charge. In refusing to give them the judge did not err.

The first special charge is covered by that part of the general charge, wherein the court charged the jury that the state is the complainant and must prove every essential averment of the indictment. The state must prove that the property taken was feloniously taken, which means that it was taken with criminal intent, with intent to convert it to their own, the defendants', use.

The second special charge is covered by that part of the general charge wherein the judge charged the jury that: "Every accused is presumed to be innocent until his guilt has been established by competent evidence to your satisfaction beyond a reasonable doubt. The burden of proof remains upon the State throughout the trial, and the accused is entitled to the benefit of a reasonable doubt upon every material question arising during the trial."

The third special charge is partly covered by those parts of the general charge wherein the judge charged the jury that intent, that is, criminal intent, is a necessary element of the crime charged, and had to be established by the state beyond a reasonable doubt. It is true that the general charge is silent on the point that "intent may be inferred from all the facts and circumstances surrounding the case." This omission, however, was favorable to defendants, since the judge had charged the jury that criminal intent had to be established, without defining the means of establishing it. The charge that intent may be inferred from all the facts and circumstances of the case is such a charge that the state alone may be expected to request, for it is a charge that enlarges the means and opportunity of establishing an essential ingredient of the crime charged, the burden of establishing which rests upon the state. Defendants have no cause to complain of the omission.

The fourth special charge is covered by that part of the general charge quoted in passing on the propriety of the refusal of the judge to give the first and second special charges. There it is made clear that the jury must acquit, unless the state establishes that the automobile was taken with criminal intent, which, as later appears, though in the same connection, must be established beyond a reasonable doubt, and that the jury must acquit unless the state so establishes, by competent evidence, every essential ingredient of the crime charged.

There is no error in the refusal to give the special charges, requested by defendants, and consequently they have no cause to complain.

■ The fifth bill of exception relates to a remark made by the district attorney in his opening argument to the jury following the close of the evidence. The remark made was: "So now we get the defense that the negroes 'hijacked' these two rats." The judge refused a motion by defendants to instruct the jury to disregard this statement.

At the time the remark was made, the district attorney was discussing the type of men belonging to the lowest type of society, better known as men of the underworld, to which class there was room to believe that defendants belonged, from evidence in the record, which had crept in largely because of the nature of the defense, and the facts necessarily surrounding it. When the objection was made, the district attorney then explained to the jury what he meant by rats, by saying that he, of course, did not refer to rats that get into barns, but to human rats, such as the guttersnipe rats, rats that hang around negro dives, where the evidence shows the defendants were found.

While it is better to omit such opprobrious terms in referring to an accused, although there is evidence in the record, as there is here, tending to establish that the accused are of that type of men, nevertheless, we feel satisfied that the remark of the district attorney, so classifying the accused, did not operate to their prejudice. It is only in an extreme case of gross misconduct, of such nature as to influence the jury, that a verdict will be set aside by reason of improper remarks made by the district attorney, and

the court should then feel that the remarks contributed to the verdict found. State v. Johnson & Butler, 48 La. Ann. 87, 19 So. 213; State v. Hamilton, 124 La. 137, 49 So. 1004, 18 Ann. Cas. 981.

■ The sixth bill of exception was taken to the refusal of the district judge to direct the jury to disregard the following remark made by the district attorney in his opening argument to the jury, to wit: "In the meantime Cliff was not satisfied with his usual trade, that of 'hijacking bootleggers', he had gotten rapacious." The judge refused to give the instruction, because he thought the instruction would have involved a comment on the evidence. It is unnecessary, however, for us to consider the refusal of the judge to give the instruction, because, notwithstanding the favorable ruling to the state, the district attorney, as appears from his argument, reduced to writing, and appearing in the record, immediately and expressly withdrew the remark, in the presence of the jury, and acknowledged to the jury that defendant was correct. The objection to the remark, which caused it to be withdrawn, was that there was no evidence before the jury that defendant had ever "hijacked" any body else. The withdrawal of the remark, and the acknowledgment of error by the district attorney to the jury, should remove, and no doubt did remove, all possibility, if any, of injury to the accused.

The seventh bill of exception was taken to the overruling of the first motion for a new trial. The motion relates solely to the rulings of the trial judge, set forth in the foregoing six bills of exceptions, which we have passed upon, and alleges that those rulings constitute error. As we have passed upon

the rulings, sustaining them, we need not do so again.

The eighth bill of exception relates to the overruling of a second motion for a new trial. This motion rests upon the ground of newly discovered evidence. It would require too much space to reproduce the newly discovered evidence in full detail, nor would it serve any useful purpose to do so. Suffice it to say that C. C. Nugent and A. J. Reynolds offer to testify that on the morning of, or following, the robbery, they visited, at about dawn, a cold drink stand operated by a negro named Arthur Richardson and a white man named Clifford Davis, who is one of the accused; that the purpose of the visit was to purchase two pints of whisky; that, at this hour, Nugent and Reynolds heard Clifford Davis order a negro, named Dan, who had been working for Davis for some weeks or months, to take a car and park it on North boulevard; that Dan got into the car, which was, at that time, parked in front of the cold drink stand and drove away; that Nugent and Reynolds sat on the steps to the cold drink stand, took several drinks, and that, while they were sitting there, Dan returned; that, when Dan entered the cold drink stand, Davis cursed him and asked him where he had parked the car, and that, when Dan answered, Davis cursed again and told Dan that he knew he had not been gone long enough to park the car on North boulevard, and then ordered him to go and park the car where he had directed; that in a few minutes, first preparing himself to deliver a flask of whisky at a hotel, Dan, together with Nugent and Reynolds, the three walking a short distance to the automobile which Dan was sent to park;

that the three got into the automobile, and drove off, Dan finally parking the car in a garage on Florida street, instead of on North boulevard; that soon after this Reynolds left the others, and that Nugent and Dan started back to the garage to get the car, but that Dan would not enter the garage, because there were people standing nearby; and that Nugent and Dan walked about one block east of the garage and parted company. The motion also shows that three witnesses, namely Hampton Collins, James Marshall, and Lonnie Williams, the last two the victims of the robbery, all of whom were witnesses subpoenaed by the State, testified that they left Baton Rouge separately and met at a negro's house, who bore the name of Arthur Knox; that these witnesses, when pressed for the full name of the person at whose house they met said that they could not remember it, as it was a creole name, but said that it sounded like "Arthur Knox"; that a careful investigation shows that there is no "Arthur Knox" in Opelousas, but, in truth, the person referred to by said witnesses bears the creole name of Arthanas Malveau and lives at or near the place designated by said witnesses; and that they are in position to show by said Malveau, who is the person to whom the witnesses had reference, that these state witnesses did not meet at his house on said occasion.

It was not error for the judge to overrule this motion for a new trial. It suffices to point out that, if Nugent and Reynolds were, as stated, present at the conversation between Davis and Dan, Davis knew of their presence and should have had them summoned. He also should have had Dan summoned. Dan, the state established, had never

left Baton Rouge and was around his usual haunts on the day of the trial. The failure to subpœna these witnesses, if, indeed, they would have been of any value, shows a failure to exercise due diligence. To obtain a new trial because of newly discovered evidence, it must appear, among other requisites, that the defendant exercised due diligence. Code Cr. Proc. art. 511. The facts in this case show that due diligence was not exercised by defendants.

As to the proffered evidence of the newly discovered witness, Malveau, at best that evidence would serve only as impeaching evidence, and that too on a minor point. A new trial will not ordinarily be granted to permit the introduction of evidence which is merely impeaching evidence. Marr's Crim. Juris., Vol. 2, p. 1108, § 718. Moreover, as to whether the victims of the robbery met at Knox's or Malveau's house, or any other, when they went to Opelousas to get the whisky, is a matter of no importance.

The verdict of the jury and the sentence are therefore affirmed.

O'NIELL, C. J., dissents from the ruling on bill No. 5.