156 So. 162

## STATE v. SWAIN.

### No. 32799.

July 2, 1934.

Dewey J. Sanchez and G. Caldwell Herget, both of Baton Rouge, for appellant.

G. L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., and John Fred Odom, Dist. Atty., and Fred S. Le Blanc, Asst. Dist. Atty., both of Baton Rouge (James O'Niell, Sp. Asst. to Atty. Gen., of counsel), for the State.

ODOM, Justice.

The defendant was prosecuted for murder, convicted as charged, and sentenced to be hanged. He appealed to this court, and here says that his conviction and sentence were illegal because of certain errors in the proceedings. These alleged errors are set out in six bills of exception.

A man named Edwards was summoned as a tales juror, and, while being examined on his voir dire, was asked if he had ever served as a juror in the trial of a capital case. He answered that he had, and was then asked by counsel for defendant, "What capital case did you serve on?" The state objected to this line of examination, and the objection was sustained. Bill of exceptions No. 1 was reserved to the court's ruling.

The bill is without merit. Counsel for defendant in their brief say that the purpose of this line of questioning was "to determine the experience that the said juror had had as gained by serving on a capital case."

Article 357 of the Code of Criminal Procedure reads as follows:

"The purpose of the examination of jurors is to ascertain the qualifications of the juror in the trial of the case in which he has been tendered, and the examination shall be limited to that purpose."

The term "qualification," as used in the Code, has reference to the state of the juror's mind and not to his experience in serving on juries, or the lack of such experience. The purpose of the examination is to determine whether the juror stands indifferent between the state and the prisoner. He is considered indifferent when he is neither biased in favor of nor prejudiced against the accused; when he has not formed or expressed an opinion as to the guilt or innocence of the accused; and, finally, when he entertains no conscientious scruples which would prevent him from carrying the law into effect, the object of the law being to select impartial jurors to try the issue between the state and the accused. See

"Voir Dire" examination, Marr's Criminal Jurisprudence.

Bill No. 2 was reserved to a portion of the district attorney's opening statement. The charge was murder, and, in order to sustain the charge, the burden was upon the state to prove that the accused was actuated by malice. In his opening statement the district attorney told the jurors that he expected to prove malice, that deceased was shot down without cause or provocation; "unless it could be accepted that he (the defendant) was justified in shooting him (deceased) down because several months ago, Roosevelt Swain created a disturbance in Albert Harris's (deceased's) place of business, at which time Harris disarmed him and was arrested for that disturbance and for carrying concealed weapons." This statement had reference to a previous difficulty between accused and deceased. Counsel for defendant concede that testimony relating to prior difficulties between accused and deceased was admissible in evidence for the purpose of showing ill will and malice, and that such testimony being relevant, it is further conceded that the district attorney was warranted in mentioning in his opening statement that he intended to introduce such testimony. But they argue that it was improper for him to mention the fact that the accused had been convicted on a concealed weapon charge; the theory being that in prosecutions for murder it is improper to admit testimony showing prior convictions for misdemeanors having no connection with the case on trial. That would be true if the charge and conviction mentioned by the district attorney had not been connected with and had not grown out of the previous difficulty between accused and deceased. But the concealed weapon charge mentioned by the district attorney was a mere incident connected with the previous difficulty, and for that reason it was not error to mention it as a part of a brawl between the parties which the state contended had caused defendant to cherish ill will towards deceased. This bill, like the first, is without merit.

The state called a witness and asked him one question, which was objected to by counsel for defendant. The question was withdrawn and never answered. Bill No. 3 recites that "Counsel for defense sought to cross-examine the witness, but was prevented from doing so by the ruling of the court."

The ruling was correct. The witness had not testified "to any single fact in his examination in chief." Code Criminal Procedure, art. 376. There was therefore no basis for a cross-examination.

Bill No. 4 was reserved to the ruling of the court permitting a witness to refer to a conversation which he had had with the accused just prior to the time he entered the house of the deceased on the day of the homicide. Counsel for defendant objected on the ground that what was said by defendant on this occasion was purely hearsay and not part of the res gestæ. The ruling of the court was not erroneous under the circumstances. Defendant had testified that his purpose in entering deceased's place of business was to use the telephone to call an officer. The witness testified that he and defendant were together a few moments prior to the time defendant entered deceased's house, and that both the witness and defendant had seen a deputy

sheriff within close proximity; the inference being that if defendant had wanted to call an officer, there was no need for his going into deceased's place of business to use the telephone, as there was an officer then present. The testimony was offered in rebuttal and was admissible.

Bill No. 5 was reserved to the refusal of the trial judge to give seven special charges. The judge gives as a reason for his refusal to give these special charges that all of them except one were covered by the general charge.

■ We have carefully checked these special charges with the general charge, and we find that they are mere elaborations of the principles correctly stated in the general charge. We note that in counsel's brief they do not refer to special charges Nos. 1 and 6, but insist that charges Nos. 2, 3, 4, and 5 should have been given. Special charge No. 2 relates to the duty of the judge to charge the jury that the defendant is to be given the benefit of every reasonable doubt, and that, if not convinced beyond reasonable doubt that the defendant is guilty, he should be given the benefit of that reasonable doubt and acquitted.

The judge charged the jury that "the accused should be given the benefit of a reasonable doubt and further that if there was a reasonable doubt in their minds as to the grade of the offense committed, the accused should be given the benefit of that reasonable doubt."

■ Special charge No. 3 has reference also to the question of reasonable doubt. It sets out that the judge should charge the jurors that each and every one of them should be convinced of the defendant's guilt beyond a reasonable doubt; otherwise a verdict of guilty could not be rendered. An instruction of that kind was not necessary because the judge in his general charge instructed the jury that it took the concurrence of all twelve of their number in order to render a verdict of any kind. From this it follows, of course, that unless each of the jurors was convinced beyond a reasonable doubt that the prisoner was guilty, no verdict of conviction could be rendered.

■ In another special charge the judge was asked to charge the jury that: "One who takes the life of another in the heat of blood or passion upon a sudden quarrel and upon reasonable provocation, without malice express or implied, though without lawful justification or excuse, is guilty of manslaughter if he is mentally accountable."

This is in substance what the trial judge told the jury in his general charge. He drew the distinction between murder and manslaughter by stating that murder is the felonious killing of another with malice aforethought either express or implied, and that "manslaughter is the felonious killing of another without malice, as in a sudden affray or in the heat of passion, or when laboring under some powerful emotion, some emotion strong enough to temporarily dethrone reason and render one incapable of forming intent."

■ The judge was asked to give this special charge: "Manslaughter is distinguished from murder by the absence of deliberation and malice aforethought. The intent to kill being formed suddenly and the

influence of violent passions or emotion which for the time being overwhelm the reason of the accused." This is fully covered by the general charge.

■■ Bill of exceptions No. 6 was reserved to the refusal of the trial judge to grant a new trial. The application for the new trial was based on the alleged ground that the jurors had been permitted to separate during the progress of the trial. The incident referred to by counsel is set out in detail by the trial judge as follows:

"The facts are simply that when the jury were returning from dinner and were on the Boulevard, that Mr. Marks, a deputy sheriff, was at the head, and Mr. Whitney, a deputy sheriff, was behind; that the jurors were walking together the usual walking distance; that Mr. Gillie Sides, a regular deputy sheriff, a full-time deputy, a deputy who had been acting as a deputy in the court room during the trial, was parked at the edge of the curb; that Mr. Deladorie asked permission of Mr. Whitney, the deputy who was in the rear of the jury, to stop and send a message by Mr. Sides; that Mr. Deladorie stepped to the curb, which was a distance of about five feet from the sidewalk, in reaching distance—and any other juror could have stood on the edge of the sidewalk and touched him—and openly asked Mr. Sides to take his keys and take a message to his wife to send him some money; that Mr. Sides asked him what his address was, and he gave his address.

"This is not a separation of the jury. A juror has a right to send a message by a deputy sheriff. A regular deputy sheriff has access to the jury at any time. * * * "

This irregularity, if such it may be called, was trivial and unimportant and not prejudicial to the defendant. There was in reality no separation of the jury. The deputy sheriff to whom the juror spoke was seated in a car parked at the curb. The juror was at all times in the presence not only of the two deputies who had charge of the jury, but in the presence of all the other jurors, and all that was said by him was said in their presence and hearing. The testimony shows that it was daylight, and that no outsider passed between the juror who spoke to the deputy and the other jurors.

Counsel for defendant cite numerous cases holding in effect that where the jurors have separated and the sheriff or his deputy has failed to properly keep them in charge, abuse and misconduct will be presumed, and the verdict should be set aside. But in the cases, cited and relied upon the circumstances are entirely different from those in the present case. In State v. Foster, 45 La. Ann. 1176, 14 So. 180, after the jurors had entered upon their deliberations the deputy sheriff took them to his house, where the ten white jurors were placed in one of the rooms of his house and the two colored jurors were placed in a kitchen at a distance of about 35 feet from the room in which the white jurors were. There, there was a complete separation during the entire night. In State v. Craighead, 114 La. 84, 38 So. 28, five jurors were accepted and sworn. Seven others were called but not sworn, and the seven unsworn jurors were placed in a room with the five who had been sworn, and the twelve were kept together during the entire night. The court held that this was improper and set aside the verdict.

In State v. Walters, 135 La. 1070, 66 So. 364, the twelve jurors were taken from the court-house to a hotel and lodged in six separate rooms, two in each room; the deputy sheriff sleeping in the hall. This was a complete separation of the jurors, and the court held that such a separation was fatal to the verdict. In State v. Pascal, 147 La. 634, 85 So. 621, the jurors were separated into several groups, eleven of them sleeping in rooms leading to a common hallway with doors closed without the presence of a deputy therein. The deputy occupied a separate room with the other juror. There was a complete separation of the jurors during the entire night, and the court held that such a separation was fatal to the verdict.

The distinction between the cases cited by counsel and the case at bar is manifest.

For the reasons assigned, the judgment and sentence appealed from are affirmed.