141 So.2d 389

**STATE of Louisiana**

**v.**

**Eugene SCOTT, Jr.**

**No. 45908.**

April 30, 1962.

Rehearing Denied June 4, 1962.

Elmo E. Lear, Robert Jones, Baton Rouge, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Sargent Pitcher, Jr., Dist. Atty., Alex Wall, 1st Asst. Dist. Atty., for plaintiff-appellee.

HAMLIN, Justice.

The defendant appeals from his conviction and sentence to death for the crime of aggravated rape. LSA–R.S. 14:42.

Presented for our consideration are nine bills of exceptions reserved during the course of trial, a motion for a new trial, and a motion in arrest of judgment.

Bill of Exceptions No. 1 was reserved when, at the end of a sanity hearing, the trial court overruled defendant's motion requesting that a new sanity commission be appointed.

The record discloses that on January 20, 1961, the trial court ordered that Doctors

C. A. Sturm, Chester Williams, and Sparkman Wyatt be appointed to examine into the present mental condition of the defendant and as to his mental condition on the date of the commission of the instant crime. A sanity hearing was held on May 5, 1961, with the accused present in court and represented by counsel.

Dr. Chester Williams, Coroner for the Parish of East Baton Rouge, testified that he observed the defendant twice; an interview at the Criminal Colony at the East Louisiana State Hospital which lasted more than fifteen minutes, and a second observation conducted on the morning of the sanity hearing which lasted less than fifteen minutes. He said that the defendant told him that "he had never heard any voices or seen any hallucinations except when he was dreaming." With reference to his findings, Dr. Williams was of the opinion that the defendant was legally sane, and stated, "I believe he understands the nature of the charges against him and he is able to assist his counsel in his defense and he knows the difference between right and wrong."

Dr. C. E. Sturm, a duly qualified and practicing psychiatrist serving as a Member of the Staff of the East Louisiana State Hospital, testified that the defendant was admitted to the hospital on January 24, 1961 and returned to the East Baton Rouge Parish Jail on April 18, 1961. He said that the defendant was under surveillance by him and the staff of the hospital during the

period of confinement, and that neither he nor the staff, as far as he knew, ever witnessed a psychotic episode. He stated that the defendant told him "that a voice would tell him what to do sometimes and sometimes it wouldn't. He said that he was bound to obey that voice whatever it told him to do, he was bound to do that." Dr. Sturm testified that he and three staff doctors, all psychiatrists, observed and examined the defendant at a staff meeting; that the majority did not believe that the defendant heard voices. Dr. Sturm said that he disbelieved the defendant because of his general actions and his general way of taking care of himself at the Criminal Colony; that a diagnostic vote was taken among the psychiatrists as to whether the defendant heard voices, and that his vote was negative. He was of the opinion that the defendant had a low intelligent quotient (in the vicinity of seventy to seventy-five) but felt that he was sane at the present time. Dr. Sturm felt that the defendant understood the nature of the crime with which he was charged, understood the seriousness of the offense, and was able to assist counsel in his defense.

Dr. Sparkman Wyatt, a practicing psychiatrist in East Baton Rouge Parish, testified that he saw the defendant for forty-five minutes to an hour in the East Baton Rouge Parish Prison about a week before the sanity hearing. He said, "My opinion was that he . . . sanity and insanity as

you know is a legal term. Medically I would have to say that he was not psychotic at the time and I suppose translated into legal terms that would mean that he was sane." He felt that the man was functioning on a rather low intellectual level during the interview. Dr. Wyatt was asked, "In other words, your pattern on his behavior at the time that you interviewed him would be his normal behavior before that time and subsequent thereto?" He answered, "Well, his usual behavior, put it that way." He said he did not feel that the defendant was psychotic even though he was of a low mentality, and further stated, "Well, sir, I could not actually ever say a person was not ever psychotic on the basis of one interview like that, but one of the things that we are supposed to be trained to do is to follow a line of questioning which will bring out in the history psychotic experiences which do follow a pattern and in which a person will reveal in giving the history of himself. There isn't enough to say that I just don't know anything at all about whether he was ever psychotic or not. I have a definite opinion based on the interview with him and based on seeing . . . I don't know how many hundreds of . . . maybe thousands of people and taking their histories and in checking back into them to verify my opinion later on."

After hearing the above testimony, the trial judge decreed the defendant "sane at the present time, to be capable of and able to understand the charge made against him for which he is now before the Court, able mentally to understand right from wrong and to assist counsel in his defense."

Counsel for the defendant objected to the ruling of the trial judge, contending that the procedure of the doctors in no way complied with the requirements set forth in LSA–R.S. 15:267 and 15:269. Specifically, counsel contended that the Sanity Commission did not comply with that part of LSA–R.S. 15:269, which provides:

"The accused shall be kept under observation by the physicians and they shall proceed with·an investigation into the sanity of the accused and they shall have free access to the accused at all reasonable times and shall have full power and authority to summon witnesses and to enforce their attendance. They shall within thirty days make their reports in writing to the presiding judge. Their findings shall constitute the report of the examination and the report shall be accessible to the district attorney and to the attorney for the accused."

Counsel further pointed out that only Dr. Sturm submitted a written report of his findings.

■ An examination of the testimony of the Members of the Sanity Commission, supra, shows that the accused was kept under surveillance at the East Louisiana

State Hospital for a substantially longer period than thirty days and was subject to observation at all times. After his return to the East Baton Rouge Parish Jail, he was observed by Doctors Williams and Wyatt, who were satisfied with his ability to stand trial. The evidence is positive that the doctors' examinations of the defendant assured them that he understood the nature of the crime with which he was charged, understood its seriousness, and was able to assist counsel in his defense. Although it is averred that Doctors Williams and Wyatt did not submit written reports, we do not find that under the circumstances herein the trial judge abused his discretion in ruling that the defendant was sane at the present time; he heard the testimony of the three doctors and was convinced of defendant's mental capacity to stand trial.

"* * * There is nothing in the statute requiring that an accused be kept under constant observation for any fixed period of time, and the legislature has not therein attempted to dictate to these experts the manner and method to be employed by them in conducting their examination, undoubtedly feeling, as do we, that they are eminently better qualified to know just exactly how to best carry out their duty in this respect as the particular facts of each case may warrant. * * *"

State v. Faciane, 233 La. 1028, 99 So.2d 333.

"* * * Under our law the judge is given the exclusive responsibility of ultimately determining the mental capacity of an accused under a plea of present insanity, subject to review only by this court, and the jurisprudence is to the effect that anyone asserting an abuse of that discretion has the burden of establishing it. * * *" State v. Faciane, supra; State v. Rogers, 241 La. 841, 132 So.2d 819.

"The question of the present sanity of the accused is to be determined solely by the trial judge, subject to review by this Court. * * *" State v. Augustine, 241 La. 761, 131 So.2d 56.

In his Per Curiam to Bill of Exceptions No. 1, the trial judge stated, "There was no evidence that the man was mentally deficient; that he did not understand the nature of the proceeding or could not assist his counsel. The evidence was positive the other way."

The jurisprudence of this State is settled that the law presumes every man is sane. State v. Augustine, 241 La. 761, 131 So.2d 56, and authorities therein cited. The law places the burden upon the accused to establish by a clear preponderance of the evidence that he is so mentally deficient that he lacks capacity to understand the nature and object of the proceedings against

him and to assist in conducting his defense in a rational manner. State v. Rogers, 241 La. 841, 132 So.2d 819, and authorities therein cited.

■ The defendant was present during the sanity hearing; his counsel presented no witnesses in his behalf, nor did they attempt to overcome the presumption of sanity. The trial judge was correct in denying defendant's motion requesting the appointment of a new sanity commission.

Bill of Exceptions No. 1 is without merit.

Bills of Exceptions Nos. 2 and 3 were reserved to the trial court's overruling defendant's objections to certain questions propounded by the District Attorney to the prospective jurors Carlton L. Garland and Joe T. Jones.

During the voir dire examination, Mr. Garland was asked, "In other words, if you are satisfied beyond any reasonable doubt of the guilt of the accused you *could* bring a verdict knowing that it carried with it the mandatory death penalty?" (Emphasis ours.) Mr. Jones was asked, "If, on the other hand, at the conclusion of the entire case there exists in your mind no doubt, no reasonable doubt, as to his guilt, *could* you bring in a verdict of guilty as charged?" (Emphasis ours.)

Counsel for the defendant contended that it was improper to ask a prospective juror whether he *could* bring in a verdict; they argued that the proper question for the State to ask was whether or not there was a conscientious scruple against the infliction of the death penalty.

The trial court ruled that, "The juror is not required to answer would he bring in any kind of verdict under any set of circumstances, but the question as to whether he could do so or not I believe is permissible and the objection is overruled."

Counsel for the defendant relies upon the following statement from the case of State v. Weston, 232 La. 766, 95 So.2d 305:

"In fact, the use of the verbs 'would' or 'could' in examinations of this sort are not strictly correct for it is highly improper to ask a juror if he would act in such a way under certain circumstances as such a question obviously endeavors to commit him in advance as to his verdict. And, to ask him whether he could do a particular thing would seem to require him either to state whether he has or has not the right to do it or whether he is able to do it, which again could tend to commit the juror as to his verdict before he hears the evidence. The pertinent inquiry is not what the juror would or could do but whether he has such a prejudice against the type of crime charged that he is conscientiously opposed, in the event of a finding of guilt, to a verdict other than one with capital punishment."

■ We have read the averred objectionable questions in context with other interrogations of these prospective jurors and find that both were asked whether they had any conscientious scruples against the infliction of capital punishment as a means of penalty to which they replied negatively. Although State v. Weston, supra, infers that the questions were not strictly correct, defendant herein suffered no prejudice by their being propounded. LSA–R.S. 15:557. The trial judge did not commit reversible error.

Bills of Exceptions Nos. 2 and 3 are without merit.

Bill of Exceptions No. 4 was reserved to the trial court's excusing the prospective juror Eugene Wilson Shaffer, Jr. for cause when he was challenged by the State.

This prospective juror was questioned as to whether he had a conscientious scruple against the infliction of the death penalty for any cause, regardless of what it was. He was also told that the test is, "have you heretofore at any time during your life and does there now exist in your mind the conscientious belief, opinion or scruple that would prevent you from imposing the death penalty if you are convinced beyond a reasonable doubt that he was guilty." The gist of the prospective juror's response was to the effect that the offense would have to be "pretty serious" for him to bring in a verdict assessing the death penalty.

The State challenged the juror, contending that if he were accepted an undue burden would be placed on the State. It argued, "but in this man's case he says not only must we prove it beyond a reasonable doubt, but it would have to be a real strong case in addition to that which I think gives a burden which the State is not required to prove and I think it is indicative of the fact that he does have a scruple against the imposition of the death penalty."

In his Per Curiam to Bill of Exceptions No. 4, the trial judge stated, "This man was not a qualified juror."

LSA–R.S. 15:357 sets forth that the purpose of the examination of jurors is to ascertain the qualifications of the juror in the trial of the case in which he has been tendered, and the examination shall be limited to that purpose. See, State v. Swain, 180 La. 20, 156 So. 162.

■ In passing upon the qualifications of jurors, the presiding judge is vested with discretion; his rulings on matters of that character will not be set aside by the reviewing court unless the error is manifest. State v. Addison, 134 La. 642, 64 So. 497; State v. Collier, 161 La. 856, 109 So. 516; State v. Chandler, 178 La. 7, 150 So. 386; State v. Kifer, 186 La. 674, 173 So. 169, 110 A.L.R. 1017. A defendant has no right to a trial by any particular jury or jurors; he has the right only to a trial by a competent and impartial jury.

State v. Ramoin, 160 La. 850, 107 So. 597; State v. McLean, 211 La. 413, 30 So.2d 187.

■ The trial judge did not abuse his discretion in excusing the prospective juror; the defendant did not suffer prejudice by his ruling.

Bill of Exceptions No. 4 is without merit.

Bill of Exceptions No. 5 was abandoned.

Bill of Exceptions No. 6 was reserved to the trial court's ruling that a statement or confession[1] admitting guilt of the instant offense was freely and voluntarily made by the defendant and therefore admissible in evidence.

Counsel contend that there is a reasonable doubt that the confession was freely and voluntarily given; they argue that the testimony of the defendant was by forcible and compulsion intoxication; they point out that the defendant was held incommunicado without benefit of counsel or friends for several hours while a number of police officers constantly harassed him and compelled him to confess.

The record discloses that prior to the admission of the defendant's confession in evidence, a hearing was held outside of the presence of the jury. At this hearing the foundation for the admission of the confession was laid. The defendant and his mother, as well as the police officers concerned, testified.

Officer Billy Wilson testified that he and Detective Legier arrested the defendant at approximately 9:30 A.M., January 1, 1961. He relates, in effect, that the defendant was observed in East Baton Rouge Parish in the presence of his mother and was then told that he was under investigation relative to aggravated rape; that he was ordered to get into a police car. Two friends of the defendant were apprehended in the area; the three were brought to the police station at approximately 10:00 A.M., January 1, 1961. The defendant was taken to the interrogation room where he was questioned extensively concerning his activities and whereabouts of the previous night; his answers were conflicting, and he was repeatedly questioned as to where he had been the night before. Officer Wilson stated that during this time the defendant was never asked whether he had committed rape on the victim. At approximately 11:45 A.M., Captain Leslie Font and Detective John Welborn entered the room; defendant was then brought to

1. In gist, the confession recites that shortly after midnight, January 1, 1961, the defendant broke into the home of the 62 year old victim, cracking a window with a hammer to permit entry. The victim (who was alone) had retired and was taken unawares by the presence of the defendant; he told her not to "hollow" and to commit certain actions, while he had the hammer in his hand. Defendant infers that the victim consented to the rape which followed and took place in her bed, from which she had not emerged.

the detective office and told to strip himself and put on other clothes which were handed to him. On examining defendant's shorts, Captain Font found a long hair; he commented that he had been looking for something like the hair and asked the defendant whether he had a hair that long on him; he then questioned the defendant as to whether there was anything he wanted to say. The defendant hung his head and responded, "Yeah, I might as well tell you, you are all going to find it out anyway." The defendant was taken to the interrogation room where he related orally his rape of the prosecuting witness. The writing of the confession, which followed the oral statement, took approximately an hour; it recites a time of 1:10 P.M.

With respect to the confession, Officer Wilson testified that, "When the statement was writ down. At the time of the—myself, Detective Legier, Detective Welborn and Captain Font was in the interrogation room and he went over his story orally and gave it to us and then Captain Font asked him did he want to give us this in writing and he said, 'Yes, I will give it to you in writing,' at which time Captain Font and Detective Welborn left the interrogation room and left myself and Detective Legier and Scott in the room at which time I taken the statement, wrote it down and in the presence of Detective Legier." Officer Wilson said that after the confession was written, the defendant read it back to the detectives; that Captain Font then read it to the defendant. The confession was made and signed to Wilson and Legier. Officer Wilson said that he saw the defendant sign each page of the six page confession; he identified his own signature, which also appeared on each page of the confession.

Officer Wilson testified that the confession was given freely and voluntarily; that the defendant was neither abused nor mistreated; that no force nor duress was used on him; that no promises or inducements were made to him. Wilson did not remember whether the officers were armed; he said that sometimes on such occasions they removed their arms. He affirmatively testified that during the period between the defendant's arrival at the police station and his giving of his confession, no officer laid a hand on him; that he was with the defendant constantly.

Detective Huey Legier confirmed the testimony of Officer Billy Wilson, supra. He also testified that the two subjects who were brought to the police station with the defendant were questioned; defendant alleged that he had been with them during a part of the evening of December 31, 1960. Detective Legier stated that he witnessed the taking of defendant's confession at approximately 1:00 P.M., January 1, 1961; that it was given freely and voluntarily in every particular; that no force, threats, promises or duress were used upon the

defendant to make him give the confession. He said that he was in the presence of the defendant during the entire time that the confession was made, and that during that time no one abused or mistreated the defendant. He did not remember whether the officers were armed. Detective Legier confirmed that he assisted in the arrest of the defendant; he said that from the moment he first saw the defendant no one in his presence used any violence on him.

Captain Leslie Font, a Commander in the Detective Division of the City Police Department, testified that he first saw the defendant at police headquarters. He said that he instructed Detectives Wilson and Legier not to question the defendant with respect to the particular offense charged until he was present. He stated that he interrogated the defendant approximately ten or fifteen minutes before he confessed. He confirmed Officer Wilson's testimony with respect to the evidence found on defendant's underclothes. He stated that the defendant did not deny or affirm his guilt when he first interrogated him; that after the defendant said, "I might as well tell you, you will find out about it anyway," he told Wilson and Legier to take the prisoner to the interrogation room. Captain Font admitted that he asked the defendant for a confession, but stated that he did not tell the defendant why he thought he should give one or make him any kind of promise; that he was in Room 120 while the defendant gave the written confession to Detectives Legier and Wilson in Room 121—the rooms had a two-way mirror. Captain Font said that he heard the defendant read the confession and also read it back to him. Insofar as violence was concerned, Captain Font testified that none was exercised on the defendant; that he (Font) was wearing a coat and his sidearms were invisible.

Detective John Welborn testified that on the morning of January 1, 1961, at approximately 11:00 A.M., he was ordered by Captain Font to bring the defendant and Detectives Wilson and Legier into the detective office. He testified that he participated in an interrogation which followed; that it lasted for only a few minutes. He said that during this time the defendant denied that he committed the instant crime. Later in his testimony, Detective Welborn stated that he did not remember asking the defendant if he had committed the crime until Captain Font pulled the hair out of defendant's shorts. He also testified that the defendant was not interrogated about the crime because of the presence of the two friends apprehended with him. Welborn described the interrogation which followed the removal of defendant's clothes and the events leading to the oral and written confession; his testimony thereto confirms that of Captain Font, and Detectives Wilson and Legier.

Detective Welborn stated that he was armed during the time that the interrogation took place; that he was wearing his coat and did not believe that the defendant could see his sidearm. He said that the defendant's confession was free and voluntary in every sense, and that no one in his presence threatened, abused or mistreated the defendant, or promised him anything; that no duress whatsoever was used upon the defendant.

The pertinent testimony of the defendant, which denies the foregoing statements of the police officers, is as follows:

"Q. Now, you heard these officers testify that you gave this statement free and voluntarily, that there was no force, no duress, no threats, is that true?

"A. No, sir.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Were you mistreated by these officers in any way?

"A. Yes, sir.

"Q. How?

"A. Well, beat me, you know.

"Q. Who beat you?

"A. Like I said just a while ago I don't know their names.

\*　　\*　　\*　　\*　　\*　　\*

"Q. What did he beat you with?

"A. His fist.

"Q. Where did he hit you?

"A. In my stomach. I bend down and one hit me behind the neck.

"Q. One of them hit you behind the neck?

"A. Yes, sir.

"Q. How many times did he hit you?

"A. Hit me twice, you know, three or four times.

"Q. Three or four times?

"A. Yes, sir.

"Q. In the stomach?

"A. Yes, sir.

"Q. Did he hit you anywhere else?

"A. One hit me behind the neck when I bend down.

\*　　\*　　\*　　\*　　\*　　\*

"Q. What's that?

"A. Not as I can recall, not as I can remember of. It wasn't but two of them hit me.

"Q. Did they threaten you in any way?

"A. They told me if I wouldn't sign that statement, I told them, I say, I didn't know what I was signing, and I wasn't going to sign no statement because I didn't know what I was signing, and they told me if I didn't sign it they would, you know, brutalize me around.

"Q. That they would brutalize you?

"A. Yes, sir.

"Q. Did you tell any one that you had been beaten?

"A. No, sir.

\* \* \* \* \* \*

"Q. Now, you are certain that that first officer that testified this morning in the blue suit struck you several times in the stomach, is that right?

"A. Yes, sir.

"Q. With his hand?

"A. Yes, sir.

"Q. And you are certain that some officer, you don't know who, hit you behind the neck?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Eugene, are you telling me the truth about this?

"A. Yes, sir.

"Q. You are certain?

"A. Yes, sir.

"Q. Do you understand the seriousness of accusing an officer of beating you, Eugene?

"A. I am telling the truth.

"Q. You are telling the truth?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Did they make you any promises?

"A. Captain Legier he told me that if I come on tell the truth it would be more easy on me.

"Q. It would be easier on you?

"A. Yes, sir.

"Q. Was that before or after you were beaten?

"A. That was before I signed the statement.

"Q. Before you signed the statement?

"A. Yes, sir.

"Q. Was that after you were beaten?

"A. Yes, sir.

"Q. Did he tell you how it would be easier on you?

"A. No, sir, he didn't say.

"Q. He just said it would be easier?

"A. Yes, sir.

"Q. Eugene, you are positive you are telling me the truth?

"A. Yes, sir.

[Officers Legier, Welborn, and Wilson were called into the Courtroom.]

"Q. Now, Eugene, you have testified that some officers beat you. Do you know Captain Font?

"A. I don't know him by his name, I know him by his face.

"Q. Well, Captain Font, you haven't mentioned him as beating you. You said that the man that beat you was dressed in a blue suit?

"A. Yes, sir.

"Q. That one man hit you in the stomach and another man hit you in the—behind the neck?

"A. Yes, sir.

"Q. I want you to get up here and point out the officer that you say did that?

"A. (Witness left witness box and walked to the three officers.) That's one.

"Q. All right, who is the other?

"A. This one, that's the one hit me behind the neck.

\*      \*      \*      \*      \*      \*

"Mr. Wall: 'Let the record show that he pointed out Legier and Wilson.'

"Q. Now, nobody else hit you but these two officers, is that right?

"A. Yes, sir."

The defendant admitted signing the confession, admitted stating to the officers that he might as well confess, and identified his signature on the confession. He stated that he was nineteen years of age and had left school when he was in the eighth grade; that he could not read and about all he could write was his name.

Ruth Scott, mother of the defendant and thirty-five years of age, testified that her son was brought home for a short time in the company of two sheriffs at about five o'clock on the evening of the day he was arrested. She said that "he was buck barefeeted and he was crying. He had on a white T-shirt and blue pants, jail pants." She further stated, "Well, he didn't tell me nothing. When they brought him in I asked him, I said, 'What's the matter? What you done did?' He didn't say nothing, but one of the sheriffs spoke and said, 'Tell your mother what you did.' He still didn't say nothing. I asked him several times. He still didn't say nothing and then I just kept on asking him and one of the sheriffs spoke to the other one and he says, 'That's his mother and I think she is supposed to know what he did,' and then he told me, one of the sheriffs told me, but he never did tell me." She testified that the defendant was all bent over and could hardly stand up or walk; that he wasn't bent over when he left the house. When asked whether her son denied the crime after it had been related to her by the officers, she said, "No, he didn't deny it because they did not let him say anything. I reckon he was scared to say anything."

Officer Legier was recalled as a witness for redirect examination. He stated that the defendant was taken to his home for

the purpose of getting the hammer mentioned in the confession; that the defendant pointed out the hammer to him. He testified that he told Ruth Scott that her son had raped the prosecuting witness. He again denied that he had ever threatened or abused the defendant in any manner to make him give a confession; that no one in his presence struck or abused the defendant in any way. Officer Legier did not recall whether the defendant was crying while he had him at his home. He said that the defendant seemed to have been walking straight and erect.

Officer Billy Wilson was recalled on redirect examination. He denied that he had ever struck the defendant; he denied that Officer Legier struck the defendant. He said he accompanied the defendant to his home for the purpose of picking up the hammer.

In ruling that the confession was admissible, the trial judge stated:

"I don't need any further argument, Mr. Pitcher. In the first place the officers made it perfectly clear that he was not cross-examined diligently and at length. In the second place, his mother, if you believe every word she said, it would not contribute a thing to proving that he had been mistreated. He didn't claim that he was bent over as a result of the incident that he de-

scribed and as far as I am concerned there is not only not any reasonable doubt, but there is not any doubt at all but what the confession whatever it is, I haven't read it, but what the statement was made by him freely and voluntarily. All of these officers have testified practically to the same thing and out of the presence of each other, and if you take four men I don't care how intelligently they are or how experienced they are their recollection would be—they would get tripped up somewhere in line of the questioning if they did anything—if there had been anything done to intimidate him or influence this man at all. I have no doubt in the world, no question in my mind, that the statement or confession, or whatever it is, was made freely and voluntarily and will be admissible." [2]

Because of the seriousness of this bill, we shall discuss in detail the jurisprudence and law pertaining to confessions.

Article I, Section 11, of the Constitution of Louisiana of 1921, LSA, recites:

"No person shall be compelled to give evidence against himself in a criminal case or in any proceeding that may subject him to criminal prosecution, except as otherwise provided in this Constitution. No person under arrest shall be subjected to any treatment designed by

2. This constitutes the trial judge's Per Curiam to Bill of Exceptions No. 6.

effect on body or mind to compel confession of crime; nor shall any confession be used against any person accused of crime unless freely and voluntarily made."

LSA–R.S. 15:451 provides:

"Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises."

LSA–R.S. 15:452 further provides:

"No person under arrest shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime."

In State v. Stewart, 238 La. 1036, 117 So. 2d 583, we held that the State must show by proof which convinces beyond a reasonable doubt that the confession was voluntary, and in State v. Weston, 232 La. 766, 95 So.2d 305, we said, "it is established by our jurisprudence that, before what purports to be a confession can be received in evidence, it must be shown by proof which convinces beyond a reasonable doubt that it is voluntary." With respect to the burden of proof, we held in State v. Honeycutt, 216 La. 610, 44 So.2d 313, "Under these provisions of our law, for a confession to be admissible in evidence against an accused in any criminal case; the burden of proof is on

the State to show that such confession was freely and voluntarily given and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. In numerous cases this court has gone so far as to hold that, before what purports to be a confession can be introduced in evidence, it must be shown, not only affirmatively but by proof beyond a reasonble doubt, that it was free and voluntary. See State v. Henry, 196 La. 217, 198 So. 910; State v. Graffam, 202 La. 869, 13 So.2d 249; * * *." Speaking of LSA–R.S. 15:451, 452, and Article I, Section 11 of the Constitution of 1921, we said in State v. Ferguson, 240 La. 593, 124 So.2d 558, 570, "This Court has consistently demanded a strict compliance with the constitutional provision and, in a legion of cases, it has been repeatedly stated that the State has the burden of establishing that a confession is free and voluntary by affirmative convincing proof before it can be received in evidence and, in a number of cases, beyond a reasonable doubt." In State v. Crittenden, 214 La. 81, 36 So.2d 645, we reasoned, "Moreover, if we entertained any doubt as to the admissibility of the confessions, such must be resolved in favor of the accused because it is incumbent on the State to affirmatively show that they were free and voluntary as a condition precedent to their admission. * * *" See, also, State v. Thomas, 242 La. 210, 135 So.2d 275; State v. Savell, 238 La. 758, 116 So.2d 513.

In Spano v. People of the State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed. 2d 1265, the United States Supreme Court appropriately stated:

"The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. Accordingly, the actions of police in obtaining confessions have come under scrutiny in a long series of cases. Those cases suggest that in recent years law enforcement officials have become increasingly aware of the burden which they share, along with our courts, in protecting fundamental rights of our citizenry, including that portion of our citizenry suspected of crime. The facts of no case recently in this Court have quite approached the brutal beatings in Brown v. State of Mississippi, 1936, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, or the 36 consecutive hours of questioning present in Ashcraft v. State of Tennessee, 1944, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192. But as law enforcement officers become more responsible, and the methods used to extract confessions more sophisti-

cated, our duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made. * * *"

In determining whether the State bore its burden of establishing the free and voluntary nature of the instant confession beyond a reasonable doubt, we must take cognizance of the following rule:

"The question of the admissibility of the confessions addressed itself to the trial judge, and his ruling will not be disturbed unless it is clearly against the preponderance of the evidence. State v. Cook, 215 La. 163, 39 So.2d 898; State v. Palmer, 227 La. 691, 80 So.2d 374." State v. Peart, 232 La. 111, 93 So.2d 920. See, also, State v. Domino, 234 La. 950, 102 So.2d 227.

It was incumbent upon the prosecution herein to produce the available witnesses, who participated in the questioning of defendant for the purpose of obtaining a confession, in order for the court to have all the facts before it. State v. Green, 221 La. 713, 60 So.2d 208; State v. Thomas, 242 La. 210, 135 So.2d 275. Captain Font and Detectives Wilson, Legier, and Welborn were all called to the stand and testified on direct and cross examination. Their testimony, supra, was affirmative to the effect that they complied with the Louisiana Con-

stitutional provision and LSA–R.S. 15:451, 15:452, supra. On redirect examination, they rebutted the testimony of the defendant.

The testimony of the defendant is to the effect that violence was used upon him, and that inducements were made to him. His mother's testimony is opinion testimony. While counsel argue that defendant was "held incommunicado" for several hours, there is no evidence to the effect that the defendant requested counsel during the interrogation or that he was denied constitutional and lawful privileges for which he could have asked.

█ The ruling of the trial judge is not contrary to the preponderance of the evidence. We find that the State bore its burden of proving the voluntary nature of the instant confession beyond a reasonable doubt, and that the trial judge did not abuse his discretion in ruling, "the statement or confession, or whatever it is, was made freely and voluntarily and will be admissible."

Bill of Exceptions No. 6 is without merit.

Bill of Exceptions No. 7 was reserved to the trial court's overruling defendant's objection to the following question propounded to Dr. Wm. T. Brown, Deputy Coroner:

"Now Doctor, you said that this examination took place at 1:00 o'clock approximately in the morning. What did the lady tell you had happened to her?"

Counsel objected to the question on the grounds that it was hearsay and not part of the res gestae, the statement of the prosecuting witness having been given to the doctor too long after the commission of the alleged offense.

Before the above question was propounded to him, Dr. Brown had testified that the victim had an area of periorbital ecchymosis—a collection of blood—around the left eye, and that, "She was in a very agitated condition. She was shaking, very emotional and upset, also crying. * * *" Dr. Brown said that his examination of the victim on January 1, 1961, between 1:00 and 1:30 A.M., revealed that she had been ejaculated by a human male; he did not recall finding anything abnormal around the pelvic area. In answer to the above question, Dr. Brown testified:

"She stated she was in bed at home and that when she awakened she found a colored male standing over her with a hammer and that he had—he told her if she would submit to him he would not hurt her and then he raped her. That's what she told me."

The victim's statement to the doctor was given within one and one-half hours of the time of commission of the alleged offense. She merely stated what had happened to her and what her offender had told her.

During the course of trial, the prosecuting witness testified and reiterated her statements to the doctor; the jury heard her statements as well as those of the doctor. Under such circumstances, the defendant was not prejudiced, and the trial judge did not commit reversible error by permitting the doctor to answer the question propounded.

Bill of Exceptions No. 7 is without merit.

Bill of Exceptions No. 8 recites:

"Be it remembered that in closing argument by the State the District Attorney made the following statement: 'I told her if she resisted she would get hurt and if she did what I want her to do I would not hurt her,' to which statement the counsel for defendant objected as improper argument since there was nothing in the record to show that defendant made any such statement, at which time the court instructed counsel for defendant not to interrupt counsel for the State.

"Whereupon, counsel for defendant then and there excepted to the ruling of the Court and reserved a formal Bill of Exception attaching thereto the evidence taken on the trial of this exception."

In his Per Curiam, the trial judge made the following statement:

"Counsel made his objection and reserved the bill immediately after the D.A. finished his argument. This was not the case when the objections were made in cases when counsel filed motions days and weeks later. To my mind it is improper to interrupt counsel before he closes his argument when the objection and reservation can be made in orderly way."

The facts leading to the reservation of this bill are to the effect that during his closing argument the District Attorney stated:

"* * * Eugene Scott told the officers that on this particular night shortly after midnight he busted in the window, he removed the screen, he used this concrete block to help himself get up through the window, he went into the kitchen and on into the bedroom where [the prosecuting witness] was asleep. A sixty-three year old woman alone in her house with this colored boy armed with this weapon, and he told the officers what he did. 'I went into the bedroom. This lady was sleep. She started to rise up. I had the hammer in my hand. I pushed her back in the bed. I still had these black trousers on. I told her if she resisted she would get hurt or if she did what I wanted her to do I would not hurt her.' The most direct threat you can have."

During argument on the objection, counsel for the defendant contended that there

was nothing in the record to show that the defendant made the threat, supra, attributed to him; counsel argued:

"Well, If Your Honor Please, I am going to object to the statements made by Mr. Wall to the effect that Scott related to these officers or any one else that he threatened this woman, * * with a hammer and that if she did not submit he would hurt her as improper argument as such is not the evidence in the case and ask that the statements made by Mr. Wall, the objection of counsel, the ruling of the Court be made a part."

The trial judge overruled the objection, the bill was reserved, and the Court stated:

"Now, Mr. Lear and Mr. Pitcher and everybody else, I am going to instruct you not to interrupt counsel in the argument. If you want to make an objection to his argument you will have to wait until he is finished. I am not going to have interruptions. Go ahead."

The trial judge had previously stated to counsel for the defendant, in the presence of the jury:

"Mr. Lear, don't interrupt counsel. I instructed the Jury all along that they are the judge of the evidence. They take it from the witnesses and not from the attorneys. The Court cannot comment upon the evidence or tell you whether it was said or wasn't said. Counter-argument of counsel is not evi-

dence. It is argument, that's all it is. The Jury will weigh the evidence and determine whether or not what he says was testified to was testified to or not. That's for the Jury. I am not going to tell the Jury that that was said or wasn't said. It is not proper for me to do so. The law doesn't permit me to do so, so don't interrupt counsel."

Then the following colloquy or argument appears in the record:

"MR. LEAR: Your Honor, the purpose of my objection was that it is not proper argument to say that this defendant made such statements which are not in evidence. I object to the statement which Mr. Wall has stated that this defendant made.

"MR. WALL: I suggest that if that is the purpose that defense counsel gets a chance to answer. You can correct me when you are at bat.

"THE COURT: Mr. Lear, please don't interrupt counsel. The Jury will know whether or not the witness said what he said the witness said or not.

"MR. LEAR: Your Honor, I would like to ask that the Court instruct the Jury as to they are to disregard any remarks of counsel that are not in evidence.

"THE COURT: Well, I have instructed the Jury that the argument of counsel is not evidence. That's all I can do. They are intelligent men. They know that."

We have examined the evidence attached to the instant bill and find that the only error the District Attorney may have committed was in stating that the defendant said that he threatened the victim when in reality it was the victim who testified that her attacker threatened her. She said, "* * * so he told me, he said, 'If you will do what I tell you to do I won't hurt you, but if you scream or warn anyone or don't do what I tell you to do, well, I will hurt you.' * * *" The defendant in his confession stated, "* * * I placed my hand over her mouth and at this time I had the hammer in my hand and I told her not to hollow as I was not going to hit her."

We do not find that the accused suffered any injury by reason of the argument of the District Attorney. Counsel for the defendant had submitted a strenuous argument to the jury to the effect that the State would have it believe one part of the defendant's confession and accept the other part as a "lie." This argument followed the opening argument of the District Attorney. Before it made its decision and rendered a verdict, the jury had the benefit of weighing the arguments of the State and of counsel for the defendant against the evidence which it had previously heard.

We do not find that the statement of the District Attorney was improper; [3] it was not so dissimilar to the words used in the confession as to have prejudiced the defendant. The District Attorney neither violated LSA–R.S. 15:381 [4] nor appealed to any prejudice.[5]

Because of the findings we have made, we conclude that the trial judge did not make any rulings or statements, or act in such manner, so as to have committed reversible error. See, LSA–R.S. 15:384; cf. State v. Breedlove, 199 La. 965, 7 So.2d 221.

Bill of Exceptions No. 8 is without merit.

Bill of Exceptions No. 9 was reserved to the trial court's overruling defendant's first motion for a mistrial.

In moving for a mistrial, counsel contended that the following remarks made to the jury by the District Attorney in closing argument were improper, contrary to law, and highly prejudicial, and left the jury with a choice in their minds of finding the

3. Attached to Bill of Exceptions No. 8 is all of the evidence taken in connection with the bill. We can therefore make a finding as to whether the statement of the District Attorney was proper or improper.

4. "Counsel may argue to the jury both the law and the evidence of the case, but must confine themselves to matters as to which evidence has been received, or of which judicial cognizance is taken, and to the law applicable to the evidence; and

counsel shall refrain from any appeal to prejudice." LSA–R.S. 15:381.

5. Counsel for the defendant cite the case of State v. Neal, 231 La. 1048, 93 So.2d 554, (wherein a question of race prejudice was concerned) as authority for their contention that counsel must make objection at the time an alleged objectionable remark is made or waive their right to such objection. See, also, LSA–R.S. 15:510.

defendant guilty as charged or taking a risk that he might be free in thirty days:

"* * * It naturally follows for all practical purposes that the entry of a plea of not guilty by reason of insanity admits the act charged, but in effect says 'I am not responsible for my acts because of my mental aberration.'

"* * * It is not a doubt borne of a merciful inclination as attempted to be aroused by Mr. Lear in his eloquent argument against capital punishment, but it is a sound, substantial doubt for which you can give a valid reason. And for which you can explain to your children and your wives why that doubt existed and why you did not return a verdict * * *

"* * * Was this the act of a mentally unbalanced mind or was this the act of a vicious rapist * * * find any reason not to bring in a capital verdict in this case turn this man loose to rape again.

"* * * Life imprisonment at Angola at the maximum is ten years and six months and in the eyes of the Pardon Board should they get weak it could be as much as six months, thirty days. * * *

"* * * That could happen to a younger woman under the same circumstances as this vicious beast * * *"

In overruling defendant's first motion for a mistrial, the trial judge stated, "I think the jury knows how to weigh such argument. They were not misled."

This Court has set forth the duties of a prosecuting officer as follows:

"'A prosecuting officer is required to base his argument and his deductions and conclusions * * * upon the evidence adduced * * *.' State v. Conners, 142 La. 206, 76 So. 611. 'The district attorney should always be careful not to go beyond proper limits, and not to take positions in argument that are not sustained by the testimony; but he is within reasonable bounds permitted to argue the case with some degree of freedom, to the extent necessary in presenting the cause.' State v. Johnson, 119 La. 130, 43 So. 981, 982. See, also, Marr's Criminal Jurisprudence in Louisiana, Second Edition, Vol. 2, Section 656, p. 1002; and State v. Tullos, 190 La. 184, 182 So. 321." State v. Shuff, 198 La. 67, 3 So.2d 278.

In State v. Poe, 214 La. 606, 38 So.2d 359, 369, we stated:

"The proposition is not well founded. In the first place, the remarks of the district attorney were fair comment made in answer to the argument of defense counsel. Article 382 of the Code of Criminal Procedure declares:

"'Counsel have the right to draw from the evidence received, or from the

failure to produce evidence shown to be in the possession of the opposite party, any conclusion which to them may seem fit, but counsel have no right to draw from such evidence or suppression of evidence an incorrect conclusion of law.'

"* * * It is well settled that a conviction will not be reversed because of the remarks of the district attorney which are provoked by opposing counsel, particularly when the jury is properly instructed with respect thereto by the trial judge and there is nothing in the record to show that the jury was actually influenced by such remarks or that they contributed to the verdict returned by them. *. * *"

Prosecuting attorneys have been permitted to make such deductions from the evidence as "Monster," State v. Spurling, 115 La. 789, 40 So. 167; "An Incarnate Devil," State v. Meche, 114 La. 231, 38 So. 152; "Infuriated Brute," State v. Thomas, 161 La. 1010, 109 So. 819; and "Rats," State v. Davis, 178 La. 203, 151 So. 78. See, also, State v. Ouzts, 162 La. 340, 110 So. 497; State v. Hills, 241 La. 345, 129 So. 2d 12.

■ . We have carefully read the closing argument of counsel for the defendant to the jury and find that the remarks of the district attorney were responses to statements which they had made.

No showing has been made that the jury was influenced by the remarks of the district attorney or that they contributed to the verdict rendered. Under such circumstances, no reversible error was committed. See, State v. Jackson, 227 La. 642, 80 So.2d 105.

Bill of Exceptions No. 9 is without merit.

Bill of Exceptions No. 10 was reserved to the trial court's overruling defendant's second motion for a mistrial.

The facts leading to the reservation of this bill are to the effect that the district attorney endeavored to elicit from the witness Ruth Scott answers affirming the facts that she was related to Emile Weston, Jr., that Mr. Lear had represented Emile Weston, Jr. in a rape prosecution, and, that she had testified on trial of Weston. The trial court sustained several objections to the questions propounded by the State. The district attorney persisted in his questioning, and instead of objecting, defense counsel moved for a mistrial.

Mr. Lear, one of the counsel for the defendant, explained to the jury, in detail, his reasons for representing the defendant in the instant case and the defendant in the Weston case. He correctly stated that such appointments were by the court, and that the appointed attorney was morally bound to do the best job he could without any compensation.

We believe that the following per curiam of the trial judge properly rejects the contention of the defendant that he was highly prejudiced by the questions propounded:

"There is nothing prejudicial in this testimony. If counsel had objected, the objection would have been sustained as the one above. No jury would hold a man responsible for what his brother or sister did."

Bill of Exceptions No. 10 is without merit.

After verdict, defense counsel filed in open court a motion in arrest of judgment and a motion for a new trial. For oral reasons assigned, the trial court overruled both motions; bills of exceptions were reserved.[6]

The motion in arrest of judgment sets forth no substantial defect patent upon the face of the record.[7] LSA–R.S. 15:-503, 15:517. It is therefore without merit. State v. Brown, 242 La. 384, 136 So.2d 394; State v. Rideau, 242 La. 431, 137 So.2d 283.

The motion for a new trial reiterates the objections set forth in the bills of exceptions previously discussed. It presents nothing new for our determination and is without merit.

For the reasons assigned, the conviction and sentence are affirmed.

Rehearing denied; McCALEB, J., is of the opinion that a rehearing should be granted restricted to a consideration of Bills Nos. 8 and 9.

6. These bills of exceptions are not in the record.
7. The motion in arrest of judgment reads as follows: "And now after verdict against the said Eugene Scott and before sentence comes the said Eugene Scott, through his Attorneys and moves the Court here to arrest judgment herein, and not to pronounce the same because of manifest errors in the record, and because no Judgment against him the said Eugene Scott can be lawfully rendered on said record."