HAMLIN, Justice:
Defendant was indicted for the murder of Mrs. Blanche Ozment in Tangipahoa Parish' *895 (a violation of LSA-R.S. 14:30), tried, convicted, and sentenced to death. He appeals to this Court from his conviction and sentence and presents for consideration ten bills of exceptions reserved to the rulings of the trial court.
Bill of Exceptions No. 1 was reserved to the ruling of the trial court which held and found that the accused was presently sane to the extent that he was able to aid and assist his counsel and to communicate and cooperate during the course of his trial.
The record reflects that the trial court, on application of counsel for the defendant, signed orders directing that the defendant be examined with respect to his present sanity and his sanity at the time of the commission of the instant crime. The orders appointing the examining doctors or Lunacy Commission were signed with the consent of the State and counsel for the accused, and a sanity hearing was held on March 5, 1964, with defendant personally present in open court accompanied by his attorneys.
Dr. John Trice, a physician and psychiatrist, and a former Director of the Phrenetic Psychiatrist Center at the East Louisiana State Hospital, testified he examined the defendant as to his present sanity. It was his opinion that the defendant was able to fully understand the nature of the proceedings against him, and that he could assist, cooperate, and communicate with counsel in his defense.
The record discloses that defendant had a record of seizures and had been a patient at the East Louisiana State Hospital prior to his examination by Dr. Trice. The doctor stated that the defendant had an organic brain impairment that could have effect on his ability to calculate and remember, but that in his opinion the defendant was not particularly handicapped in his memory.
Dr. Trice further testified, “Mr. Gregoire spent most of his time in I would say in the last fifteen years in institutions, either one or the other, and it is just related to his psychopathic personality, being in trouble.” When asked whether defendant’s history of being incarcerated in mental institutions altered his ability to assist his counsel, Dr. Trice replied, “Not one bit, no sir.”
Dr. Joseph Robert Butler, a professor of Psychology at Louisiana State University, a Clinical Psychologist, and a Consultant in Phrenetic Psychology at the Phrenetic Psychiatrist Unit of the East Louisiana State Hospital, testified he examined the defendant. He said he administered the Bender and Gastelt tests and found pronounced evidence that the defendant had organic brain damage. Dr. Butler was of the opinion that the defendant could assist counsel in his defense despite the facts set forth in his medical record.
*897 Dr. Luther Ricks, a physician, and Coroner for the Parish of Tangipahoa, testified he examined the defendant in January, 1964, and that in his opinion the defendant was able to help in his defense at that time.
In a clinical report of May 14, 1963, addressed to Judge Ben N. Tucker, Dr. Victor J. Weiss, Clinical Director of the East Louisiana State Hospital, said, “These statements seem to fully cover my opinion, but I would like to add that this man’s organic brain impairment does limit his capacity to calculate and remember.” Counsel for the defendant contends that because of the foregoing statement the trial judge abused his discretion (LSA-R.S. 15:267) in ruling that defendant was presently sane and able to assist his counsel.
Counsel for the defendant has taken the statement of Dr. Weiss, supra, out of context. A reading of the entire report reflects that Dr. Weiss was of the opinion that the accused knew right from wrong and was of sufficient intelligence to understand the nature of the proceedings against him and cooperate in his defense.[1]
Counsel for the defendant further contends that the trial judge abused his discretion in ruling the defendant presently sane because the testimony of Drs. Trice and Butler with respect to defendant’s brain impairment shows that defendant is not sane.
It is true that the doctors testified that defendant has a brain impairment, but, they likewise testified that they were of the opinion that he could assist counsel in his defense.
“The jurisprudence of this State is settled that the law presumes every man is sane. State v. Augustine, 241 La. 761, 131 So.2d 56, * * * The law places the burden upon the accused to establish by a clear preponderance of the evidence that he is so mentally deficient that he *899 lacks capacity to understand the nature and object of the proceedings against him and to assist in conducting his defense in a rational manner. * * * ” State v. Scott, 243 La. 1, 141 So.2d 389.
Herein, counsel for the defendant consented to the appointment of the doctors selected by the trial judge to serve on the Lunacy Commission. Counsel presented no independent evidence at the Lunacy Hearing. The testimony of the doctors preponderated to the effect that defendant could understand the proceedings against him and assist in his defense. '
The testimony attached to Bill of Exceptions No. 1 convinces us that the trial judge did not abuse his discretion (LSA-R.S- 15 267) in ruling that defendant is presently sane. His ruling was predicated upon the tests set forth in the Louisiana Code of Criminal Procedure and enunciated in the jurisprudence wherein insanity was pleaded. State v. Chinn, 229 La. 984, 87 So.2d 315; State v. Jenkins, 236 La. 256, 107 So.2d 632; State v. Collins, 242 La. 704, 138 So.2d 546.
Bill of Exceptions No. 1 is without merit.
Bill of Exceptions No. 2 has been abandoned.
Bills of .Exceptions Nos. 3, '4, and 5 will be treated together. ’ ’
Bill of Exceptions-No. '3 was reserved-to the ruling, of. the. trial-.judge that ..an alleged verbal declaration made by defendant to Deputy Sheriff Oswald Johnson and Chief of Police Edward S. Tucker was of a free and voluntary nature.
Bill of Exceptions No. 4 was reserved to the ruling of the trial judge that an alleged verbal declaration made by defendant in the presence of Chief of Police Edward S. Tucker was free and voluntary.
Bill of Exceptions No. 5 was reserved to the ruling of the trial judge that an alleged verbal declaration made by defendant in the presence of Deputy Sheriff Oswald Johnson was free and voluntary.
The testimony attached to these three bills of exceptions, taken outside the presence of the jury and in its presence, reflects that defendant, who had allegedly abandoned the car he allegedly drove away from the scene of the crime, and who had allegedly hidden the body of the victim in the bushes near the car, was arrested at a private residence in Marrero, Louisiana, by Deputy Sheriff Harry Joynton and Deputy Sheriff Oswald Johnson of Tangipahoa Parish and a Jefferson Parish detective on. the day following the commission of the instant crime. Chief of Police Edward S. Tucker of Pontchatoula, Louisiana, who had separately travelled to Jefferson Parish, joined the arresting officers and defendant. . Tucker, Johnson and the defend^ ant sat on the back seat of the^car — ^-a'Jeri ferson.Parish.Unit-r-with Joynton andoth? ers seated -in the'-ffoiiti of The-'car.' They *901 drove to the Gretna Courthouse and Jail, and during this drive the controversial verbal declaration was allegedly made by defendant.
The testimony of the officers is unanimous and affirmative to the effect that no force, duress, or coercion was exercised upon defendant during the drive. Their testimony is also unanimous and affirmative that the defendant was offered no reward, and that neither leniency was offered nor promises made to him. Their testimony is affirmative to the effect that defendant was not abused, threatened, shoved, hit, pushed or intimidated.
Deputy Johnson emphatically denied that during the drive he made a statement to the defendant to the effect that they should stop the car and hang him.
Outside the presence of the jury and in its presence, in substantially the same words, Chief of Police Tucker testified:
“One question he wanted to know was what we had him for and I said, T think you know what we have you for’ and he said, T ain’t done nothing,’ and I said ‘Well, how did you get in that house out there? Did you jerk the hook off the screen, or how did you get in there ?’ and he said, ‘Naw, I didn’t jerk no hook off the screen, she let me in,’ and I said ‘Who do you have reference to?’ and he said ‘Mrs. Ozment.’ I said, ‘Why did she let you in the .house?’' He said, ‘Well, she knew- me. She knew who I-was. I lived out there for a long time.’ I said, ‘Well, Buster, why did you do what you done?’ and he said, T don’t know.’ I said, ‘Did you do it?’ and he said, ‘Yeah, but I don’t know why.’ I said, ‘Why did you do it?’ and he said, ‘I don’t know.’ ”
Deputy Johnson, seated next to the defendant, testified affirmatively that defendant made the foregoing statement in his presence, and that he heard the defendant answer the questions propounded by Chief of Police Tucker. Deputy Joynton, seated in the front of the car, did not hear the discussion between Chief of Police Tucker and the defendant and did not hear the declarations of defendant.
Outside the presence of the jury, the defendant gave the following testimony:
“ * * * We took off for the Gretna jail and by the time we took off like, Mr. Tucker said — well I said, ‘What you got me for, I didn’t do nothing.’ He hit me in the ribs about three times and he said, ‘You know what I am talking about’ and I said, ‘No, I don’t and he hit me here upon my chest again. We rode down through that new lane through there and Mr. Oswald Johnson said, ‘We ought to stop at one of these light poles up here and hang him,’ and I told him that if that suited him just to go ahead and help himself. : When we got tó the Gretna Jail they brought me upstairs and they put me *903 up there, and when I was up there getting finger printed one of the Deputies that was finger printing me asked me what kin was that little Gregoire boy that come in with them and I told him that was my brother’s son, and we was all four in the back seat. Harry Joynton and the Jefferson Parish Officer were the only two in the front seat.”
When defendant was asked whether he made the statement testified to by Chief Tucker, he denied having made any such statement and said he was threatened a few times after the purported statement was made.
Mrs. Corinne Watson, Deputy Sheriff, and Stenographer for the Parish of Tangipahoa, testifed that she took a statement from the defendant in question and answer form. She said it was given in the jailer’s office in Tangipahoa Parish in the presence of Deputies Johnson and Joynton.
Counsel for the defendant admitted that if the statement was given, it was given without threat, intimidation, hope or reward, promise or anything of that nature.
Deputy Joynton testified that the defendant stated he talked to the victim while sitting on a sofa and then hit her with his fist; that the defendant further stated he took the victim into the back bedroom of her house and hit her again and then dragged her out and put her in the car.
Deputy Johnson testified that the statement contained substantially, to the best of his knowledge, what defendant previously said in his presence during the drive to the Gretna Courthouse and Jail.
Defendant, outside the presence of the jury, testified that Deputy Joynton asked him to make a statement, and that he told Joynton to write it like he wanted to. He further testified that when the statement was brought to him for signature on several occasions he refused to sign it, telling Deputy Joynton, “I ain’t going to sign this statement, I ain’t made. I didn’t make it and I ain’t going to sign it.’ ”
The statement allegedly given at the Tangipahoa Jail was not introduced in evidence, but testimony of its having been given went to the jury. When testifying with respect to this statement, Deputy Joynton again stated that he did not hear the conversation between the defendant and Chief of Police Tucker during the drive to the Gretna Jail.
In his Per Curiam to Bill of Exceptions No. 3 (which also applies to Bills of Exceptions Nos. 4 and 5), the trial judge stated:
“From the testimony of Edwin S. Tucker, Chief of Police of the Town of Pontchatoula, Louisiana, also a deputy Sheriff, and Oswald Johnson, Deputy Sheriff for Tangipahoa Parish, the Court concluded the alleged verbal declaration was freely and voluntarily made. These men are reputable officers of long standing *905 and their credibility is without question. That [their] testimony was not marred by any personal interest in the outcome of the case.”
Counsel for the defendant contends that the verbal declaration allegedly made during the drive to the Gretna Jail, if given, was not of 'a free and voluntary nature. He argues that it was admitted into evidence without any showing that the defendant had previously been advised of his right to counsel. He relies on the case of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, which was decided by the U. S. Supreme Court on June 22, 1964, eighteen days after the verdict in the instant case was rendered on June 4, 1964.
The record reflects that no mention of counsel was made to defendant when he was riding with the officers and “in-custody.”
In the light of Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, decision rendered June 20, 1966, rehearing denied, October 10, 1966, which holds that the case of Escobedo, supra, affects only those cases in which the trial began after June 22, 1964, the date of that decision, we conclude that since the verdict finding Gregoire guilty as charged was rendered on June 4, 1964, eighteen days before the decision in Escobedoj June 22, 1964, the admissibility of his alleged oral declaration is to be determined in accordance with the law which was in existence at the time the statement was allegedly made.[2]
Herein, we are concerned with a verbal declaration which is the equivalent of an admission. “ * * * the rule is established by numerous decisions of this Court that admissions involving the existence of criminal intent or inculpatory facts are governed by the rules applicable to confessions. * * * ” State v. Maney, 242 La. 223, 135 So.2d 473. See, State v. Jones, 230 La. 356, 88 So.2d 655; State v. Bueche, 243 La. 160, 142 So.2d 381.
“It is well settled in the law of this state that, before a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducement, or promises. * * * ” State v. Richard, 223 La. 674, 66 So.2d 589. See, LSA-R.S. 15:451; State v. Palmer, 227 La. 691, 80 So.2d 374; State v. Cloud, 246 La. 658, 166 So.2d 263; State v. Ward, 187 La. 585, 175 So. 69. As stated supra, the testimony attached to Bills of Exceptions Nos. 3, 4, and 5 preponderates to the effect that the alleged declaration in the instant case *907 was given freely and voluntarily and not made under the influence of fear, duress, intimidation, menaces, threats, inducement, or promises.
The question of the admissibility of the verbal declaration addressed itself to the trial judge, and his ruling will not be disturbed unless it is clearly against the preponderance of the evidence. State v. Peart, 232 La. 111, 93 So.2d 920; State v. Cook, 215 La. 163, 39 So.2d 898; State v. Walker, 229 La. 229, 85 So.2d 497; State v. Scott, 243 La. 1, 141 So.2d 389; State v. Hughes, 244 La. 774, 154 So.2d 395.
We do not find that the trial judge erred in admitting into evidence the alleged verbal declaration and ruling that it was given freely and voluntarily. Its effect went to the jury which rendered the verdict herein.
Bills of Exceptions Nos. 3, 4, and 5 are without merit.
Bills of Exceptions Nos. 6 and 9 will be discussed jointly.
Bill of Exceptions No. 6 was reserved when the trial judge overruled defendant’s objection to the testimony of the witness Ray I-Ierd with respect to certain clothing he examined, alleged to be that of the defendant.
Bill of Exceptions No. 9 was reserved when the trial judge overruled defendant’s objection to the introduction in evidence of clothing, allegedly belonging to the defendant, removed from the home of William Leonard Gregoire, brother of the defendant.
The facts associated with Bills of Exceptions Nos. 6 and 9 show that Deputy Joynton, accompanied by Deputy Johnson and Chief of Police Tucker, was investigating the instant crime. A search was being made for the accused and for evidence connected with the crime. After leaving the home of defendant’s parents in New Orleans, the officers went to 617 Urbandale, Marrero, Louisiana, the residence of defendant’s brother. There they found a young man, defendant’s nephew, Leonard Gregoire, Jr., who was alone. The officers informed him for whom they were looking and what they wanted, and he invited them into the house. The officers searched the house and found wet clothes and shoes and a partially packed suitcase in a closet of the back bedroom. The shoes and wet clothes were bundled and wrapped and taken by the officers. Deputy Joynton affirmatively testified that the young man, Leonard Gregoire, Jr., invited the officers to enter the house, and after such invitation they entered.
The clothes and shoes, supra, were eventually turned over for examination to Ray Herd, Chemist and Supervisor of the Louisiana State Police Crime Laboratory. Mr. I-Ierd, who testified with respect to his examination of the clothing, as well as to his examination of the victim’s clothing, *909 some possessions, and a sample of blood taken from the victim’s body, said that some articles were negative as to blood stains and others contained such stains.
Counsel for the defendant objected to the introduction in evidence of the clothing and shoes, supra, on the ground that they were obtained through an illegal search and seizure conducted in violation of the Fottrth Amendment to the United States Constitution as well as Article I, Section 7, of the Louisiana Constitution of 1921. Counsel objected to Mr. Herd’s testimony with respect to the clothing and other articles on the ground that his testimony related to evidence obtained through an illegal search and seizure. The same contentions are advanced herein, and many authorities are cited in support thereof.
We do not find that there was an illegal search and seizure herein. As stated supra, the officers were permitted and invited to enter the house by Leonard Gregoire, Jr. There is no evidence that he objected to the search of the house or objected to the officers’ leaving with the shoes and clothing — seizure. These articles were introduced in evidence, and Mr. Herd testified as to their condition. It was for the jury to determine whether the clothing was connected with the accused.
Bills of Exceptions Nos. 6 and 9 are without merit.
Bills of Exceptions Nos. 7 and 8 are related.
Bill of Exceptions No. 7 was reserved when the trial judge overruled defendant’s objection to the testimony of Ray Herd with respect to seminal fluid on the victim’s panties.
Bill of Exceptions No. 8 was reserved when the trial judge overruled defendant’s objection to the testimony of Ray Herd with reference to the mention of seminal fluid on the clothing of the defendant and on the sheets, pillowcases, and bedspread of the victim.
Counsel’s objections were based on the ground that the defendant was not charged with any sexual offense, and that such remarks were inflammatory and prejudicial. Herein, counsel urges that evidence of the commission of a crime other than the one charged is not admissible, and that the State cannot claim that the evidence was admissible under the theory of “Res Gestae” because it was not necessary to prove rape in order to prove murder. He further argues that a mistrial should have been ordered when the averred inadmissible evidence was admitted.
Ray Herd’s testimony with respect to his findings is very brief. It was relevant evidence in that it explained the condition of the victim’s clothing and personal belongings shortly after the commission of the instant offense. Mr. Herd’s testimony *911 with respect to defendant's alleged clothing is that there were stains on his shorts.
We find that the trial judge did not err in his rulings. We quote his per curiams to Bills of Exceptions Nos. 7 and 8:
“In the opening Statement the State declared that ‘Laboratory and other experts will be called to report their findings of the evidence turned over to them and accumulated by them.’
“The Court felt that the evidence in question was included in this general Statement. The Court considered that the evidence related to the commission of the alleged crime, and was in response to and in conformity with the opening Statement made by the District Attorney.” Per Curiam to Bill of Exceptions No. 7.
“The objection was made after the testimony was already before the jury and in evidence, and at that time no motion for a mistrial was made. Moreover, the evidence would tend, with all other facts, to establish a possible motive for a crime with which the defendant was charged. This evidence conceivably related to the chain of circumstances involved in the Commission of the alleged crime.” Per Curiam to Bill of Exceptions No. 8.
Bills of Exceptions 7 and 8 are without merit.
Bill of Exceptions No. 10 was reserved to the ruling of the trial judge denying counsel for the defendant the use of the examination and report of Dr. Robert M. Weinecke, who had been appointed with Dr. Victor Weiss on April 4, 1963 to examine the present mental condition of the defendant.
The evidence reflects that Dr. Weinecke’s report of his examination of the defendant was allowed by the court to be introduced in the record. However, with the consent of counsel for defendant, a second Lunacy Commission was appointed to examine the defendant and make formal findings; it reported and its members testified as stated in our discussion of Bill of Exceptions No. 1, supra.
At the time of trial, the court stated that it was agreed that Dr. Weinecke would not be summoned nor used as a witness in the case; it was also agreed that Dr. Weinecke was not a resident of Louisiana. The court ruled that it was not proper for counsel to examine Dr. Trice with respect to the examination or report of Dr. Weinecke.
Attached to the instant bill is testimony of Drs. Trice and Butler. They reiterated and added to their testimony forming part of Bill of Exceptions No. 1. Dr. Trice testified that it was his opinion that defendant was legally sane at the time of the commission of the alleged offense. Dr. Butler testified that from a legal standpoint he had to say that defendant was sane. When asked whether in his opinion *913 at the time of the commission of the alleged offense the defendant was able to discern the difference and to choose between right and wrong, he replied: “This is impossible to say with exactness but I found no evidence which would say that Mr. Gregoire was any different at that time than he was at the time T examined him. I found him sane at the time I examined him.”
The trial judge correctly ruled that it was not proper for counsel to examine Dr. Trice with respect to the examination or report of Dr. Weinecke. We do not find that defendant suffered any prejudice from the ruling of the trial judge. LSA-R.S. 15:557. The trial judge correctly stated in his per curiam:
“The Motion filed by defense counsel on January 6th, 1964 indicated the inability to obtain Drs. Weinicke and Weiss for examination, and requested for that reason the appointment of Drs. Trice and Butler, which request was granted by the Court.
“By agreement of counsel Dr. Weinecke was not summoned and was not to be used on the trial, and Drs. Trice and Butler were to be used as witnesses in lieu of Drs. Weinecke and Weiss.
“The Court allowed the report of Dr. Weinecke to be introduced in the record, and considers the defendant was not prejudiced -in any way.”
Bill of Exceptions No. 10 is without merit.
Bill of Exceptions No. 11 was reserved to the trial court’s denial of defendant’s motions for a new trial.
This bill presents nothing new for our consideration. With the exception of a complaint as to an instruction given by the trial judge to the jury with respect to life imprisonment, the three motions for a new trial are an accumulation of the matters raised in the bills of exceptions1 hereinabove discussed. We find no error in the instruction of the trial judge which is alleged to have been, “A life sentence means that the defendant could be paroled in ten and one-half years.”
Bill of Exceptions No. 11 is without merit.
For the reasons assigned, the conviction and sentence are affirmed.

. »* * 3:
“As you are aware of all of the past circumstances concerning this individual, I will not reiterate them now. All examinations have been completed and it is quite obvious that this man has Convulsive seizures and has had such since the age of six or seven. This undoubtedly contributes to some organic Brain Impairment which he presently shows. He has X-ray Evidence on Examination of the skull of Osteoma. Electro-encephalogram tracings have been done on several occasions and these do not confirm the Diagnosis of Epilepsy. But this does not have to be an abnormal finding in order to confirm a diagnosis of Seizures.
“It is my opinion that the accused knows right from wrong and is of sufficient intelligence to understand the nature of the proceedings and able, if he desires, to cooperate with his defense. These statements seem to fully cover my opinion, but I would like to add that this man’s organic brain impairment does limit his capacity to calculate and remember. I would like also to add that it seems very apparent that this man will be a further danger to society and. it is hoped that the Court does not take this Statement as being presumptuous.'
“Please feel free to send the authorities for this man at your convenience.”

. A discussion of the ease of Escobedo, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977, and other recent decisions of the United States Supreme Court, is set forth in our opinion handed down this day in State of Louisiana v. Evans, 249 La. 861, 192 So.2d 103.