**Robert Joseph GREGOIRE**

v.

**C. Murry HENDERSON, Warden.**

**Misc. No. 1028.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Aug. 20, 1969.

Alfred E. Mitchell, Plaquemine, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Jack E. Yelverton, Asst. Atty. Gen. of Louisiana, Baton Rouge, La., Leonard Yokum, Dist. Atty., Twenty-First Judicial District, Hammond, La., for respondent.

WEST, Chief Judge:

Petitioner, Robert Joseph Gregoire, is presently incarcerated in Louisiana State Penitentiary awaiting execution of a death sentence imposed upon him by a Louisiana State Court jury in June of 1964. He was indicted for the murder of one Mrs. Blanche Ozment in Tangipahoa Parish, Louisiana, tried, convicted, and sentenced to death. During his jury trial there were ten bills of exception reserved which formed the basis of his appeal to the Supreme Court of the State of Louisiana. His appeal was heard, and judgment was rendered by the Louisiana Supreme Court affirming the conviction and sentence. See State of Louisiana v. Gregoire, 249 La. 890, 192 So.2d 114 (1966). Petitioner now applies to this Court for a writ of habeas corpus alleging that his constitutional rights were violated in that (1) he was subjected to improper interrogation following his arrest; (2) he was not represented by counsel for a period of some five months following his arrest on September 23, 1962; and (3) he was the victim of an illegal search and seizure resulting in the obtaining of evidence which was improperly used against him during his trial.

This Court appointed Alfred E. Mitchell, Jr., Esquire, to represent petitioner and an evidentiary hearing was held on May 6, 1969, at which hearing petitioner was present and testified. Since all of the grounds asserted here by petitioner were raised by him during his trial and also included in his appeal to the Louisiana Supreme Court, the State, rather than call their witnesses again, chose to rely on the transcript of the State Court proceedings, a complete copy of which was filed with this Court for review. After hearing the testimony of petitioner, and after carefully studying the transcript of the proceedings had against petitioner in the State Courts, this Court concludes that the issues herein presented were correctly passed upon by the State Courts which found, both as a matter of law and fact, that there was no merit to petitioner's contentions.

On the night of September 23, 1962, one Mrs. Blanche Ozment was brutally murdered in her home in Tangipahoa Parish, Louisiana. Her body was placed in an automobile and driven several miles into St. James Parish, where the body was hidden in some bushes and the car abandoned. On the night of the murder, witnesses had seen petitioner driving the same automobile later found abandoned and had seen him drive up to the residence of Mrs. Ozment. The next door neighbor heard him go to the door of Mrs. Ozment's house and heard her open the door and admit him. One of the neighbors heard him say "Mrs. Ozment, this is Mr. Gregoire," before she admitted him to the house. Some twenty minutes later she heard Mrs. Ozment say "Oh no" and then she heard a "terrible noise—a loud thump, like a dull sound." She then saw a man "dragging something out" and "he threw it in the car." After the police were notified of these events their investigation led them first to the home of petitioner's parents on Carondelet Street in New Orleans and then to the home of petitioner's brother, William Leonard Gregoire, at 617 Urbandale Street, in Marrero, Louisiana. When the officers went to the door of this home on Urbandale Street, they were met by a seventeen year old boy, William Leonard Gregoire, Jr. The officers told young Gregoire what and who they were looking for, and the young man invited them in to search the house. During this search,

which was made without a warrant, but with young Gregoire's consent, and actually at his invitation, the officers found some wet clothes, shoes, and a partially packed suitcase, all of which belonged to petitioner. The officers took these things with them and went into the woods a mile or so from the residence in search of petitioner. They were aided in their search by some dogs and other searchers. They finally came upon a house occupied by a negro man and found petitioner sitting on the porch. They advised him that he was under arrest and put him in the police car and went first to the jail in Gretna, Louisiana, and from there to the courthouse at Tulane and Broad Street in New Orleans. From there they called the police in Amite, Louisiana (Tangipahoa Parish) and requested someone to meet them at the end of the causeway leading to Tangipahoa Parish. They were met there by a deputy sheriff of Tangipahoa Parish, and the petitioner and the seized articles of clothing were turned over to him. Petitioner was then taken to the jail in Tangipahoa Parish where he remained until after his trial.

During the automobile trip from the point of his capture to the Gretna Courthouse and Jail, Chief of Police Edward S. Tucker, Deputy Sheriff Oswald Johnson, and petitioner sat in the back seat of the automobile. Deputy Sheriff Harry Joynton and another deputy from Jefferson Parish who was driving the car were seated on the front seat. Petitioner's brother, Leonard Gregoire, was also seated on the back seat. It was during this ride to Gretna that the officers allege and testify that the petitioner voluntarily made certain inculpatory statements. Petitioner denied that he made any such statements. When, during the trial, the prosecution attempted to introduce the testimony of Chief of Police Tucker to show the inculpatory statements made by petitioner, an objection was made on petitioner's behalf. The jury was retired and both Deputy Johnson and Chief of Police Tucker testified that such statements were in fact

made by petitioner. Chief of Police Tucker testified:

"One question he wanted to know was what we had him for and I said, 'I think you know what we have you for' and he said, 'I ain't done nothing,' and I said 'Well, how did you get in that house out there? Did you jerk the hook off the screen, or how did you get in there?' and he said, 'Naw, I didn't jerk no hook off the screen, she let me in,' and I said 'Who do you have reference to?' and he said 'Mrs. Ozment.' I said, 'Why did she let you in the house?' He said, 'Well, she knew me. She knew who I was. I lived out there for a long time.' I said, 'Well, Buster, why did you do what you done?' and he said, 'I don't know.' I said, 'Did you do it?' and he said, 'Yeah, but I don't know why.' I said, 'Why did you do it?' and he said, 'I don't know.' "

Deputy Johnson testified that such statements were made by petitioner while he was present in the car. Deputy Joynton, who was seated in the front seat, said he did not hear the discussion between petitioner and Chief of Police Tucker. Petitioner says he made no such statements, despite the fact that he was struck in the chest two or three times by Mr. Tucker's elbow, and despite the fact that Deputy Johnson said they ought to "hang him from the next light post." He did admit, however, that after arriving at the Gretna jail he told news reporters that "I don't know why I did it."

All of the officers in the car vehemently deny that petitioner was at any time threatened or struck, and they all deny that any threat to "hang him from the next light post" was ever made.

Later, when petitioner arrived at the jail in Tangipahoa Parish, he gave another statement which was reduced to writing by Mrs. Corinne Watson, Deputy Sheriff and Stenographer for the Parish of Tangipahoa. The petitioner refused to sign this statement, and both at his State Court trial and before this

Court he denied ever having made the statement. Upon objection being made during his trial to the introduction of the unsigned statement, the State refrained from introducing the statement but did use testimony of the statement having been given by petitioner. The question of whether or not the statement alleged to have been made by petitioner in the automobile and the statement made by him in the Tangipahoa Parish Jail were in fact made, and if so, whether or not they were voluntarily made, was heard by the Trial Judge outside of the presence of the jury. After hearing all of the witnesses, including petitioner himself, the Trial Judge ruled that the statements were, in fact, made, and that they were freely and voluntarily made without duress, intimidation, threats, inducements or promises. After this independent ruling by the Court, based upon testimony heard out of the presence of the jury, the testimony concerning the making of these statements went to the jury for its evaluation along with the other evidence in the case. The right of the defendant to have the voluntariness of his confession judicially determined before it is submitted to the jury was set forth thusly in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964):

> "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760, and even though there is ample evidence aside from the confession to support the conviction. * * * Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession."

This requirement was met in the present case. The question of whether or not the confessions or inculpatory statements allegedly made by petitioner were made, and if so, whether or not they were voluntarily made, was resolved adversely to petitioner by the Trial Judge after an in depth hearing on the issue out of the presence of the jury. A careful review of the record of both the trial and the appeal leads this Court to now conclude that the Trial Judge committed no error in allowing the introduction of the testimony concerning those statements. The weight and credibility ultimately to be given to the statements were proper questions for the jury. See Andrews v. United States, 309 F.2d 127 (CA 5–1962).

As to petitioner's complaint that he was not afforded the right to counsel during his "in custody" interrogation and for some five months following his arrest, this Court holds that under the law as it was at that time, petitioner was not thereby deprived of his constitutional rights. Petitioner's reliance on Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is misplaced. In Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), the Supreme Court held that Escobedo affects only those cases in which the trial began after June 22, 1964. The trial in petitioner's case ended with a verdict of guilty on June 4, 1964. Thus *Escobedo* is not applicable. But as stated in *Johnson:*

> "Thus while *Escobedo* and *Miranda* provide important new safeguards against the use of unreliable statements at trial, the non-retroactivity of these decisions will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim."

Recognizing this right, in spite of the non-retroactivity of *Escobedo* and *Mi-*

*randa,* this Court nevertheless concludes that the evidence and the record herein clearly show that petitioner's rights were recognized and protected insofar as his involuntariness claim is concerned. The Trial Judge concluded, after a lengthy and carefully conducted hearing, that the statements allegedly made by petitioner were in fact freely and voluntarily made, and that his constitutional rights, under the law as it then existed, were adequately and properly protected. This Court, after its own independent hearing and after its own independent review of the State Court records, cannot say that the Trial Judge erred. The fact that petitioner was without counsel for five months does not per se indicate a deprivation of constitutional rights. While an accused is constitutionally entitled to counsel at every critical stage of the proceedings, Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L. Ed.2d 114 (1961); Kerr v. Dutton, 393 F.2d 79 (CA 5–1968), nevertheless, in order to claim a violation of that right he must show some prejudice by reason of such deprivation. Scarbrough v. Dutton, 393 F.2d 6 (CA 5–1968). The record of the evidentiary hearing in this case discloses that, according to petitioner's own testimony, he made no plea or inculpatory statement, aside from those statements already passed upon, until after consultation with the two attorneys appointed by the Court to represent him. He has shown no prejudice by reason of the delay in appointment of counsel to represent him, and hence his claim of deprivation of constitutional rights on this ground is without merit.

■■ Lastly, petitioner alleges an illegal search resulting in an illegal seizure of evidence used against him at his trial. This claim is without merit. Petitioner, according to his own testimony, had no permanent place of abode but instead, since his return from California, stayed a few days with his father and then went to spend some time with his brother. He had personal belongings at his sister's house in California, some at his father's house, and some at his brother's house. He was not a permanent resident at any one place. It was to his brother's house that the policemen's search led them. It was there that they found young Leonard Gregoire, Jr., petitioner's nephew, who was a permanent resident in his father's home. He was seventeen years of age, and when the police went to the house and told him who and what they were looking for, the young man told them to come in and invited them to search the house. This was the search that produced the evidence about which petitioner complains. There is no evidence of any kind in this record to indicate that the search was not made at the invitation of young Gregoire. There is no evidence of any kind of any coercion, duress, or misrepresentation having been used in connection with this search. The only ground upon which petitioner relies to support his claim that the search was illegal is that young Gregoire, who was seventeen years of age at the time, was "under age" and had "no right to allow anyone to admit that house (sic) without his daddy's consent." This same contention was urged before the Trial Court and the Supreme Court of the State of Louisiana and decided adversely to petitioner. This Court concurs in the holding of the Louisiana State Courts. In Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the Supreme Court indicated that it would no longer bar a challenge as to the constitutionality of a search because of a finding that the petitioner lacked some required property interest in the premises searched. Consequently, the petitioner does have a standing to challenge the validity of the search and seizure. However, since the petitioner was not a tenant or a lessee of the property, and since, at best, he was merely an invitee on the premises, he obviously did not have exclusive control of the premises. He was, at best, one in joint possession of the house and in such a situation, the owner, or the other in joint possession with him, may validly consent to a search of

the premises. Drummond v. United States, 350 F.2d 983 (CA 8–1965); Maxwell v. Stephens, 348 F.2d 325 (CA 8–1965), cert. den. 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 490; Commonwealth of Pennsylvania, ex rel. Craig v. Maroney, 348 F.2d 22 (CA 3–1965).

Thus, there being no question but what young Gregoire was a permanent resident of the premises, he certainly had the right to consent to a search of the premises. Petitioner does not contend that young Gregoire did not give his consent to the search and seizure but merely says that he was "under age" and thus not capable of giving his consent. We find nothing in the law to lead us to the conclusion that a seventeen year old boy, permanently living in his home, is incapable of giving valid consent to a police officer to search the premises. It is of more than passing interest to note that neither at the trial of the case nor at the hearing before this Court did petitioner produce young Gregoire to try to show that the consent to search and seize was not voluntarily given. While there is much authority for the proposition that where a search is conducted without a warrant and the prosecution relies on the consent of the owner or occupant of the premises, the Government has the burden of persuading the Court by clear and convincing evidence that the consent was freely, intelligently and voluntarily given, nevertheless, in this record there is no evidence of any kind that the search was not conducted pursuant to consent freely, intelligently, and voluntarily given by one who had a legal right to give such consent. Both the Trial Court and the Supreme Court of Louisiana found that the consent given by young Gregoire measured up to constitutional standards. Petitioner's counsel, both at the trial and at the evidentiary hearing before this Court, did not introduce any evidence to contradict the State's assertion that the consent to search was freely and voluntarily given by Young Gregoire. Instead, counsel relied entirely upon the allegation that he was too young to give legal consent. Search as we may, we are unable to find any authority to support the proposition that a seventeen year old boy cannot, as a matter of law, give consent for a search of the premises in which he lives with his family. The age of the boy should, of course, be considered by the trier of fact to be one factor in determining whether or not consent was freely given. The Trial Court, after seeing and hearing the witnesses, concluded that consent was freely given, and petitioner has not in any way attempted to introduce the most direct evidence available on this point, i.e., the testimony of young Gregoire himself. Petitioner bore the burden during the evidentiary hearing before this Court of showing by convincing evidence that the Trial Court's finding was erroneous. He has failed to do so, and this Court thus concludes that the evidence produced at the trial, and about which petitioner complains, was not the fruit of an illegal search and seizure.

For these reasons, it is the opinion of this Court that petitioner's application for the issuance of a writ of habeas corpus must be and it is hereby denied.